DARLING, Assignee, etc., *v.* BERRY and Wife, and others.

*(Circuit Court, D. Iowa. 1882.)*

1. BANKRUPTCY—REV. ST. § 5045—HOMESTEAD EXEMPTION.

By the passage of the act of March 3, 1873, embodied in section 5045 of the Revised Statutes, it was the intention of congress to prescribe by its own direct legislative authority, irrespective of state laws, the *conditions* upon which the homestead exemptions should exist, making the provisions of the state laws "existing" in 1871 the *measure* or *criterion* as to the *amount* allowed.

2. SAME—SAME—SAME—TIME DEBT WAS CONTRACTED.

Under section 5045, Rev. St., the bankrupt's homestead exemption is valid against *all debts*, whether reduced to judgment or not, without, regard to the *time* when contracted, and regardless of state constitutions, laws, and decisions.

3. SAME—SAME—CONSTITUTIONALITY OF.

A bankrupt, revenue, or naturalization law, which, by its terms, is made applicable alike to *all* the states, without distinction or discrimination, is not unconstitutional merely because its *operations* may be wholly different in one state from another.

4. RULE AS TO CONSTRUCTION OF LAW.

Where the constitutionality of a law is a matter of doubt, and the decisions upon the question are conflicting, to set aside such an act as unconstitutional would be presumption in an inferior judge.

The plaintiff in this case is the assignee in bankruptcy of the firm of Parsons, Berry & Warren, of which the defendant William A. Berry was a member. The object of the bill is to assert the claim of a creditor of the said firm, D. W. Grimes, against the homestead of said Berry. It is conceded that the debt of the claimant Grimes was contracted prior in time to the purchase and acquisition of the homestead, and therefore that by the law of Iowa the homestead was not exempted from the payment of the debt. By the law of Iowa the claimant had a clear right to enforce his claim against the homestead

by judgment and execution. The claimant may, therefore, we think, through the present plaintiff, as assignee in bankruptcy, maintain this bill, unless he had been deprived of his right to subject the homestead to the payment of his claim by the amendment to the bankrupt law, passed March 3, 1873. That amendment provided that there should be exempted from the operation of the assignment in favor of the bankrupt such property "as is exempt from levy and sale upon execution, or other process or order of any court, by the laws of the state in which the bankrupt has his domicile at the time of the commencement of the proceedings in bankruptcy, to an amount allowed by the constitution and laws of each state, as existing in the year 1871, and such exemptions shall be valid against debts contracted before the adoption and passage of such state constitution and laws, as well as those contracted after the same, and against liens by judgment or decree of any state court; any decision of any such court rendered since the adoption and passage of such constitution and laws to the contrary notwithstanding."

*John C. Power* and *P. Henry Smythe*, for plaintiff.

*A. M. Antrobus, Thomas Hedge, Jr.,* and *Anderson Bros. & Davis,* for defendants.

Love, D. J. *First.* The plaintiff's counsel contend that "the bankrupt law did not intend to exempt anything which the legislature of the state had not exempted or sought to exempt by its law," and counsel say: "We deduce, therefore, that if the bankrupt law only intends to exempt such property as the state law did, or meant to make the the state law the measure of exemption, then the property here is not exempt for the reason that it is not by the state statute." *Secondly.* Counsel insist that "if the bankrupt law did not intend to go further and create a new exemption by the bankrupt law itself, and which the state law did not give, it is void, being unconstitutional, there being no uniformity in it."

With respect to the first of these propositions, which involves the construction of the amendment of March, 1873, (Rev. St. § 5045,) I must confess that my own judgment was, when the case was argued before me in the district court, with the plaintiff's counsel; but I have been led by a more thorough consideration of the question to change my opinion upon that point.

The question is, was it the purpose of congress, in giving the bankrupt's homestead exemptions, simply to recognize the state laws as furnishing the rule with respect to both the amount exempted and the conditions of exemption, or was it intended by congress to pre-

scribe by its own direct legislative authority, irrespective of state laws, the conditions upon which the homestead exemptions should exist, making the provisions of the state laws "existing" in 1871 the measure or criterion as to the "amount allowed?" As a matter of course, congress could not have intended to prescribe directly and by its own authority the conditions of the homestead, and at the same time, by the same act of legislation, accept the conditions provided by the various state laws. We must inevitably accept one hypothesis or the other, and not both, in the construction of the act. The true purpose of congress may be demonstrated by considering the causes and events which led to the amendment of 1873. It is undeniable—indeed, it is admitted on all hands—that the condition of things in Virginia, growing out of her legislation, constitutional and otherwise, regulating homestead exemptions, led to the amendment of 1873.

By article 11 of the constitution of that state, adopted in 1869, it was provided that every householder or head of a family should be entitled, in addition to the articles then exempt from levy or distress for rent, to hold exempt from levy and sale under execution, etc., issued on any demand for any debt theretofore or thereafter contracted, his real and personal property, etc., to the value of $2,000, to be selected by him. An act of the general assembly of Virginia, approved June 27, 1870, gave effect to this provision by prescribing in what manner and upon what conditions such householder could set apart and hold such exemptions. Under the bankrupt law, as originally enacted, there was exempted from the assignment of property required to be made to the assignee, among other such property as was exempt from levy and sale under execution by the laws of the state, etc., to an amount not exceeding that allowed by the state exemption law in the year 1864.

By an amendatory act passed on the eighth of June, 1872, this provision was changed so as to give the bankrupt the benefit of exemption laws in force in 1871. In 1872 the court of appeals of Virginia unanimously decided (22 Grat. 266) that the provision of the constitution just referred to, and the statute giving effect to the same, so far as they applied to contracts entered into or debts contracted before their adoption, were a violation of the constitution of the United States, and therefore void. After this decision on the third of March, 1873, congress passed another act, which is substantially the same as section 5045 of the Revision. The amendment of 1873 is as follows:

"Be it enacted, etc., that it was the true intent and meaning of the act approved June 8, 1872, entitled, etc., that the exemption allowed the bankrupt by said amendatory act should, and it is hereby enacted that they shall, be the amount allowed by the constitution and laws of each state, respectively, as existing in the year 1871, and that such exemption be valid against debts contracted before the adoption and passage of said state constitution and laws, as well as those contracted after the same, and against liens by judgment or decree of any state court; any decision of any such court rendered since the adoption and passage of such constitution and laws to the contrary notwithstanding."

Here we find that the law of Virginia giving retrospective homestead exemptions was declared null and void because it impaired the obligation of contracts. Such exemptions, therefore, did not exist in Virginia when the amendment of 1873 was passed. Congress, it is admitted, aimed by the amendment to do what Virginia had not been able to accomplish, namely, to give the bankrupt the benefit of the retrospective homestead exemptions which had been annulled in Virginia. This congress was fully empowered to accomplish. Congress could, by its own direct legislation, pass a law impairing the obligation of contracts, but congress could not make a state law, which violated the constitution, valid. Did congress intend to recognize and adopt, as furnishing a rule to its courts in the administration of the bankrupt law, state legislation which was utterly void by reason of its violation of the federal constitution? Could congress breathe the breath of life into a dead state law—dead by reason of its repugnance to the constitution? So far from its being the purpose of congress to adopt or respect the law of Virginia touching homestead exemptions, it was manifestly intended by the amendment to overrule and disregard the state law; for, by the law of Virginia as it stood after the decision in 22 Grattan, the creditor had a clear right to satisfaction out of the debtor's property, without regard to his claim of homestead, and the creditor might have secured a lien upon the property claimed as a homestead by the judgment or decree of the Virginia courts. Congress, therefore, could not effect its purpose by giving a retrospective homestead in Virginia under the bankrupt law without utterly disregarding the Virginia law, and overriding any liens which might be established by the judgments of its courts; and if there is any meaning in words this is precisely what congress aimed in express terms to do.

It being thus manifest that no valid law existed in Virginia creating a retrospective homestead, congress could not establish such an exemption by adopting or recognizing what did not exist. Congress,

therefore, could accomplish its admitted purpose in Virginia only by direct legislation giving the bankrupt a homestead against debts which had been adjudged to be valid claims upon the homestead under the law of that state. Now, is this consistent with the view that congress intended to adopt state laws "in existence," whether in force or not, whether repealed or not repealed, whether constitutional or otherwise, as a measure of the amount of property to be exempted. The original bankrupt act of 1867 limited the amount of exemption by the state laws in force in 1864, though possibly repealed or not in force in 1867, or when the proceeding in bankruptcy should be commenced.

I have hitherto considered the question with reference to the intention of congress to prescribe a homestead in Virginia without reference to the laws of that state; or, rather, in contravention of its existing law. I have so considered the question because there can be and is no serious doubt that congress intended, with reference to the condition of things in Virginia, at least, to provide for a homestead by its own direct legislative power to pass a general and uniform bankrupt law. But although congress, in adopting the legislation in question, had in view the exigency existing in Virginia, yet it could not pass a special law to meet the state of things relating to the homestead in that state, without applying its provisions to the other states; since such a law applicable to the condition of things in Virginia alone, and not to the other states, would clearly have been unconstitutional. It would not have been a uniform bankrupt law. Congress could not, without a flagrant violation of the federal constitution, have so framed a law as to give the bankrupt in Virginia a homestead exemption in disregard of the state law, and in contravention of liens by judgment and decree, without making the same provisions applicable to other states. It would have been simply absurd for congress to have attempted to make such a provision for bankrupts in Virginia by its own direct legislation, and to have provided, as to the other states, that their own laws should prescribe the conditions as to debts upon which the bankrupt should be entitled to the homestead. Hence congress was compelled, in order to provide a homestead against antecedent debts in Virginia, where no such homestead law was in force, to frame a law with general provisions, applicable alike to Virginia and all other states where homestead laws existed. This could only be accomplished by a law of congress prescribing directly the conditions of exemption against prior creditors for all the states alike, without reference to state statutes, except in so far as they might be

taken as a criterion or measure of the amount of property to be exempted.

From these general views, which seem to my mind conclusive, let us turn to the particular language of the amendment: It is provided that "such exemptions shall be valid against debts contracted before the adoption and passage of such state constitutions and laws, as well as those contracted after the same, and against liens by judgment or decree of any state court; any decision of any such court rendered since the adoption and passage of such constitutions and laws to the contrary notwithstanding." These words must have some construction; they cannot be rejected as surplusage; they are not ambiguous. What do they mean? What can they mean, except that the bankrupt's homestead exemption shall be valid against all debts, without regard to the time when contracted, and regardless of state constitutions, laws, and decisions? The exemption shall be valid against debts contracted before and after the passage of laws, etc., "in existence" in 1871, and against the judgments and decrees of *any* state court. Time before and after an event includes all time, and therefore the words used in the amendment imply that the exemption shall be valid against debts at whatever time contracted. They can mean nothing else. To extort any other meaning from them by interpretation would be to violate the fundamental maxim of construction. "The first maxim of interpretation," says Vattel, "is that it is not allowable to interpret what has no need of interpretation;" and he proceeds to point out the fatal and mischievous consequences of violating this rule in the interpretation of deeds and treaties.

The words "debts contracted" before and after the passage of a law, etc., must, *ex vi termini*, mean *all* debts, and not some particular debts to the exclusion of others. If we reject this interpretation how shall we discriminate between debts which are and debts which are not included in the provision? What rule of classification shall we adopt? Congress manifestly did not intend to make any such discrimination, for congress in express terms made the exemption valid against the very highest class of debts, namely, such as were made *liens* against the homestead by the solemn judgments and decrees of state courts. It had been the policy of all bankrupt laws to respect and preserve the liens of creditors under state laws and decisions; and the doctrine that the adjudications of the state courts upon state constitutions and laws should be accepted and enforced in all federal tribunals, had, long before the legislation we are now consider-

ing, been embedded in the very foundations of federal law. Yet here we find congress providing that the bankrupt's homestead exemption should prevail against state laws, and state decisions and liens established by the solemn judgments and decrees of state courts. By what possible terms could the will of congress have been made more conclusively manifest that the bankrupt's homestead should prevail, by the exclusive authority of congress, against all debts in spite of state laws, decisions, and judgments? We know positively that such was the intention of congress with respect to debts secured by the laws, judgments, and judicial decisions of the state of Virginia, and how can we suppose that congress did not intend that debts in other states should be subject to the same conditions as against the homestead? Did congress intend to make one law for Virginia and another and different law for the other states?

The claimant's debt is a mere float. It has never been reduced to judgment. It is no lien upon the bankrupt's homestead. It is a valid claim under the law of Iowa against the homestead; nothing more. This debt is clearly, at whatever time contracted, whether before or after the passage of certain *state* laws, within the express terms of the act of congress postponing debts to the homestead exemptions. What reason is there to take the plaintiff's claim out of the act? Is it because it was valid under the law of Iowa against the homestead? So were the debts in Virginia, which, it is admitted, the amendment intended to set aside in favor of the homestead. Nay, it would appear that some of the Virginia creditors had established their claims as liens against the homestead by the judgments and decrees of the courts of their state; and these liens against the homestead as well as other judgment liens, it was the manifest purpose of the amendment of 1873 to subvert. Would it not, then, be most unreasonable to suppose that it was the purpose of the amendment of 1873 to subvert and set aside the judgment liens of other creditors against the homestead, and save such mere floating claims as that of the plaintiff? Suppose the claimant had reduced his demand to judgment, and had thus made it a lien upon the homestead: he would then have brought himself within the very words of the amendment, that the exemption should be valid " against liens by judgment or decree of *any* state court." In that case, would not the amendment have set aside his lien in favor of the homestead; and is he now better off because his claim remains in its original shape, of a floating claim against the homestead exemption.

I can see no difference between the case of the creditors under the Virginia law which congress intended to set aside in favor of the homestead, and the claimant's case under the law of Iowa. The claimant had a right by the law of Iowa to satisfaction out of the bankrupt's property without respect to the homestead. He might have enforced his claim by judgment and secured a lien. The same is true with respect to the rights of the creditors in Virginia under the law of the state. It cannot be doubted that congress intended to postpone the Virginia creditors to the right of homestead, and to establish the same even as against liens by judgment and decree. Why should a different intention be imputed to congress in regard to an Iowa creditor? Why should not the same result to which the Virginia creditors were exposed occur to an Iowa creditor, if the bankrupt act is a uniform law?

The section (5045) which we are considering provides that there shall be exempted—

"Such other property, etc., as is exempted from levy and sale upon execution or other process, or order of any court, by the laws of the state in which the bankrupt has his domicile at the time of the commencement of the proceedings in bankruptcy, to an amount allowed by the constitution and laws of each state as existing in the year 1871."

The word "existing" is here evidently used for a purpose. There was no law giving a retrospective homestead exemption "in force" in Virginia in 1871. The law which had been passed being unconstitutional, and so declared by the highest court of the state, was a dead letter; it was not in force, but in one sense it existed in 1871. It had no potential "existence," but it "existed" in form. So there may have been in other states exemption laws which "existed" either potentially or in form in 1871, but which, perhaps, were not in force when the amendment of 1873 was passed. I think it must have been the purpose of congress to adopt these state laws "existing" in 1871, whether potentially or in form, whether repeated or not, whether in force or not in force, so far as they furnished a measure of the amount of homestead exemption. If there was in any state no law at all existing in 1871, "either potentially or in form," it is clear that the legislation of the section of the bankrupt law in question could not be applied to bankrupt estates in such states. I can see no other construction of section 5045 by which the provision last above quoted can be made to harmonize with the terms of the section immediately following, upon which the present case turns.

Let us now proceed to consider the constitutional question. With due deference, I venture to suggest that the judges who have discussed the constitutionality of this amendment have applied to it an erroneous test of uniformity. They seem to me to treat the question as depending rather upon the operation or working of the law, than upon its application according to its own terms to the various states of the Union. In my opinion, when a bankrupt, revenue, or naturalization law is made by its terms applicable alike to all the states of the Union, without distinction or discrimination, it cannot be successfully questioned on the ground that it is not uniform, in the sense of the constitution, merely because its operation or working may be wholly different in one state from another. The circumstances and conditions existing in the states of this Union are infinitely various. No law which human ingenuity could possibly frame, would be uniform in the sense of operating equally or alike in the various states, with their different conditions and diversified interests. The constitution provides that "all duties, imposts, and exercises shall be uniform throughout the United States." Now, suppose one or more states should succeed in suppressing utterly the manufacture and sale of ardent spirits and malt liquors, then a federal tax upon these commodities would be entirely inoperative in such states. In such case millions might be collected under an excise law in Illinois, and not a cent in Iowa. The operation of such a law would then be anything but uniform in the two states; but would any court for that reason declare a general law imposing a tax of the kind unconstitutional? Again, a tariff law might be anything but uniform in its operation upon different states. It might foster the industry of a manufacturing state and oppress that of a strictly agricultural state. But could it on this account be said to be not a uniform law within the meaning of the constitution, and therefore void? Suppose, again, congress should in a bankrupt law, as it did in 1867, adopt the homestead exemptions prescribed by state laws in force at a specified time; and suppose there should in some states be no law giving homestead exemptions, while in others such exemptions should by law exist,—then the operation of the bankrupt law would not be uniform with respect to the homesteads; but would it be for that reason unconstitutional? All that the constitution intends is that congress shall not pass partial revenue and bankrupt laws. It shall not prescribe one law for this state or section, and a different law for that state or section. The law must be general and uniform in its provisions, but its working and operation may be very different in different states, owing to

their diverse conditions and circumstances. Congress can prescribe a uniform law, but it cannot create uniform conditions and circumstances in the various states of the Union:

Now, applying these principles, I am not able to see that the amendment of 1873 is unconstitutional. The amendment does not by its terms apply to any state or section. It is prescribed for all the states alike. Congress by this amendment prescribed by direct legislation in contravention of state laws the conditions upon which the bankrupt should take his homestead. These conditions are applicable to all the states without distinction. The act of 1867 provided that the bankrupt should be entitled to the homestead allowed by the state of his domicile, in force when the proceedings in bankruptcy were commenced, "not exceeding that allowed by the state exemption laws in force in 1864." It is clear that under this act one law of the state might prescribe the conditions of the right of homestead and another regulate the amount of property to be allowed. But in the amendment of 1873 the conditions are prescribed directly by the act of congress, and the amount to be regulated by the state law. The bankrupt law of 1867 has been declared constitutional by the highest judicial authority in this circuit below the supreme court. *In re Beckerford*, 1 Dill. 45. Now this act did not directly prescribe a homestead exemption. It adopted the state laws regulating homesteads. If in one state there was by law no homestead, the bankrupt, under the act of 1867, would get none, and the creditors would be entitled to all his property; while in another state, with a homestead law in force, the bankrupt would get the exemption and the creditors take subject to it. This surely would not be uniformity in the working or operation of the law; nevertheless, such a law would be held uniform in the constitutional sense of the word.

This view enables us, I think, to see clearly the unsoundness of Chief Justice Waite's argument in *Re Eckert*, 10 N. B. R. 5. The burden of the chief justice's argument seems to be that a law of congress which adopts the exemptions under the state laws as they are enforced in the states is uniform because the creditors get just what they are entitled to in *pro rata* distribution. They are entitled to all the property of the bankrupt not exempt from execution by the state law, and this they get in the distribution under a bankrupt law which adopts the state law. This is just, and it is uniform. That it is just, there is no doubt; that it is uniform, may be questioned. It will not do to confound the justice and uniformity of the law in considering this constitutional question.

It follows, from Chief Justice Waite's view, that if there was in a state no law giving any exemption, the creditors would take the whole of the bankrupt's property. If the amount exempted in one state was large, and another small, the sum distributed to the creditors would vary accordingly; but still they would get all they could have reached by the state execution laws. This argument is plausible, and it might be irrefragable if the creditors only were to be considered in judging of the uniformity of a bankrupt law. But if the question of uniformity is to be solved by considering the operation of the law on classes of persons, why are the bankrupts in the several states to be ignored any more than the creditors? Are not the bankrupts to be provided for as well as the creditors? If there is no law in one state giving the bankrupt any homestead exemption at all, while in another state the exemption is trifling in amount, and in still another large, is there any uniformity in the operation of a bankrupt law adopting such state laws, as far as the bankrupt is concerned? If two bankrupts lived in sight of each other across a state line, and one held property under the law worth five or ten thousand dollars and the other nothing, it would be hard to convince them that a bankrupt law working out this result was uniform in its operation. Manifestly, if the bankrupts in the different states are to be considered, the argument of uniformity advanced by the chief justice must be fallacious.

But I think it is open to another fatal objection. If the view of the chief justice be correct, it follows that congress could not by direct provision, without reference to state laws, prescribe the conditions and the amount of homestead exemption. For congress would, if it had no reference to state laws, be compelled to prescribe the same conditions and the same amount of exemption for all the states. This is self-evident. Congress could not provide the different conditions and amounts for the different states. What would be the result? The chief justice's theory of uniformity would be overthrown. The creditors in a state with no law giving a homestead exemption would not get in distribution what they are entitled to under the state law. They would be compelled to suffer a deduction equal to the amount of exemption engrafted by congress upon the bankrupt's estate. And so, whether the homestead exemption under the state laws were great or trifling would make no difference whatever to the creditors; all would be compelled to suffer the same deduction under the law of congress; none would secure under the bankrupt law, in *pro rata*

distribution, what they would be entitled to as exempt from execution under their respective state laws. Moreover, all estates, great and small, would be subject to exactly the same amount of exemption. In some cases, the exemption under the congressional law might take the whole estate; in others, it would amount to a mere trifle in proportion to the whole value of the estate. Now, will any one seriously contend that congress might not in a bankrupt law fix the conditions and amount of homestead exemption without reference to state laws? I think not; and yet congress could not do this if the chief justice's theory be correct, that uniformity in a bankrupt law consists in the equal and *pro rata* distribution among creditors of all the bankrupt's property not exempt from execution under the state laws. In the following cases the constitutional question seems to have been decided adversely to Chief Justice Waite's opinion: *Re Beckerford,* 1 Dill. 45; *Re Jordan,* 8 N. B. R. 180; *Re Kean,* Id. 367; *Re Smith,* Id. 401; *Re Everitt,* 9 N. B. R. 90; *Re Jordan,* 10 N. B. R. 427; *Re Smith,* 2 Woods, 458.

Finally, it is undeniable that the constitutional question involved in the case is a very doubtful one. The utter conflict of opinion and decision in the southern district is the best possible evidence of the doubt and difficulty which surrounded it. On the one hand we have the judgments of Chief Justice Waite, Judge Bond, and Judge Bryant, holding the amendment of 1873 to be unconstitutional; on the other, the decisions of numerous judges sustaining the law as constitutional. Now what is the duty of any court with respect to a law of doubtful constitutionality?

Chief Justice Marshall, in the *Dartmouth College Case,* 4 Wheat. 625, speaking for the whole court, said:

"This court can be insensible neither to the magnitude nor delicacy of the question. The validity of a legislative act is to be examined, and the opinion of the highest law tribunal of the state is to be revised, etc. On more than one occasion this court has expressed the cautious circumspection with which it approaches the consideration of such questions, and has decided that in no doubtful case would it pronounce a legislative act to be unconstitutional."

So spoke the supreme court of the United States, by the mouth of its illustrious chief, concerning the constitutionality of a state statute, and this doctrine has been often reiterated by other courts and jurists. What, then, would it be becoming an inferior federal court to do touching an act of Congress, the constitutionality of which is, to

say the least, a subject of the gravest doubt? To disregard and set aside *such* an act as an infraction of the constitution would, I think, be in an inferior judge evidence of the most inexcusable presumption.

There is no doubt that congress, in this amendment, passed a sweeping retrospective law. Now, is there anything extraordinary in this, since all the bankrupt laws are in their essence retrospective? The amendment in question interferes with the relation of debtor and creditor, and works injustice to the latter. But the question with us is not the justice, but the uniformity, of the law. All bankrupt laws proceed upon considerations of policy and humanity, rather than strict justice. In this respect they are like statutes of limitations. Congress, seeing that the bankrupt was, with or without his consent, to be stripped of all his property for the benefit of his creditors, provided out of the wreck a shelter for his family against all debts, whether contracted before or after the passage of state homestead laws. Clearly there was no ground of equity upon which an exception could be made in favor of the creditor whose debt was contracted before the acquisition of the homestead in preference to the creditor whose debt was contracted before the passage of the state homestead law. The first had no merit over the last. In both cases the creditors had contracted with the bankrupts upon the faith of their entire property before any homestead existed. A state exemption law could not be retrospective because it impaired the obligations of contracts. Therefore, a creditor whose debt was contracted before the passage of the state homestead law, equally with a creditor whose claim antedated the purchase of the homestead, was entitled, by both equity and the state law, to satisfaction out of the homestead property. Both classes of creditors standing thus upon the same ground of equity and strict law, what reason is there to assume that congress intended to include one class and exclude the other in passing the retrospective amendment of 1873?

Judgment for defendant.

Judge McCRARY concurs.

original complainant, a plea was put in setting up that it did not appear by the bill that the plaintiffs had ever been appointed administrators by a court of com-